# Exhibit "A"

# Transcript of Charles Jacob Stratmann

**Date:** May 19, 2026
**Case:** Heron Enterprises, LLC -v- Starboard Yacht Group LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

Okay. Do you have any licenses or certifications?

A I don't know how current they are. I mean, I was a broker for a while in terms of a salesperson license. I let that lapse, although I could renew it.

You know, I have several, you know, trade certifications. But -- and, you know, I have obviously a four-year degree from the Wharton college of business; business licenses; patents, you know? But, yeah, my profession doesn't really require any other specific licenses.

Q Gotcha -- okay.

A Most -- most of the stuff I learned was, you know, through doing the work.

Q Hear ya.

Okay. What is your current job title?

A My wife says I don't have a job, but I guess I'm the CEO of several companies without any employees at the moment.

Q Okay. How long have you been doing that?

A I started running companies as a general manager in 2006, and I founded Starboard Yacht Group in 2008, and so I've been the CEO of Starboard Yacht Group since '08.

us. And then I had these integrators, they would basically run the quarterlies and they would check in once a month with the team. And they would keep a lot of the records of my team, and they would use these cloud softwares, right? And so my stuff is scattered all over the place.

Q Gotcha.

A One was called Bloom Growth. Another one was called 90. Okay? And then -- and then I hired a full-time integrator, and it was -- I outsourced it. And so then he came in, I wouldn't say full-time, but part-time, like one day a week, because the company was doing really, really well. And it was really working and growing until it wasn't.

Q Gotcha.

Okay. Just to backtrack a little bit, are you the sole member of Starboard?

A Yes.

Q Okay. Have you always been the sole member?

A Yes.

Q What was the initial capital contribution made to the company around the time of its formation?

doesn't want to be a litigator. Because of this case, he's done with the justice system and he doesn't want to litigate anymore.

So anyway, I'm working on his sailboat.

Q Okay. Other than that, are you currently handling any client projects?

A No. Not at this time.

Q All right. Let's turn to the project at issue in this case.

What is your understanding of what this lawsuit is about?

A I, in good faith, was the right guy for the job. I secured the job. I engineered the job. We design the job. And then we tried to execute the job, and we were stopped. And then we tried to resume the job, and we weren't allowed.

And I understand everything in between and why, but it's -- it's -- it's not right, Emily. So I think this lawsuit needs to, you know, exist because it's not right. And your client shouldn't be damaged because we were forced to stop completing this project.

Q Okay. Just for a housekeeping matter, when I say Heron, do you understand that to mean Heron Yacht Group LLC?

Q Gotcha.
Okay, so recognizing that the hot work is a separate thing that needs to coincide, how long would a project like this usually take?
A Two months.
Q Okay.
A Two to three months.
Q Okay. And so this e-mail states that the total deposit for Humphree equipment secured and shipped with an estimate of 60 days from funding; is that correct?
A Yeah. Because that's -- that's Humphree's language. So that's -- when you place an order with Humphree, they have a, you know, standard 60-day turnaround time.
Q Okay.
And so let me jump over to what I've marked as Exhibit 3.
(Plaintiff's Exhibit 3, standard Starboard buyers order form, marked for identification.)
(Ms. McWey shared Plaintiff's Exhibit 3 on the screen.)
Q Do you see that?
A I do.
Q And you recognize this document?

A Yes.
Q -- prior --
A Yes, it does.
Q Okay. And so this 175,000 total due represents the amount paid for the hot work?
A Yes.
Q Okay. Turning back to the buyer's order, was there a deposit due for the buyer's order --
A Yes.
Q -- do you recall?
Do you recall the amount of that deposit?
A I don't recall the -- the amount. But, you know, it -- it's 100 percent of the parts and 50 percent of the labor and I know that -- I think Brian and my team came up with that number and e-mailed it to the boat or maybe forward it to me.
Q Does it -- would 362,183 sound correct?
A Yes.
Q Did Heron pay that deposit?
A Yes. I mean, that's what he paid. I certainly know that they paid a lot of money, and we needed to get the work done.
Q And another 187,000 was paid in around November 2024, correct?

best to streamline these questions to we can wrap up at a reasonable time.

Interrogatory Number 2, so we just went over -- this is the buyer's order that we just discussed, correct?

A Yes.

Q And then does this contract value represent the buyer's order plus the subsequent payment in November?

A Yes.

Q Okay. And obviously we just discussed that you were involved in negotiating and overseeing the project, right?

A Yeah. I -- I'm always involved. I have clear project managers who are accountable. But, you know, I -- I keep an eye on everybody.

Q Gotcha.

And I think we can skip past this. I think we'll get into some of the communications.

So you mentioned that "Performance became impossible due to third-party interference," and that this notification was received from Laz in December of 2024, correct?

And this is the same thing we just discussed?

at this point?
A I had -- we are. You know, my attorneys start advising me of bankruptcy a year and a half ago. I don't believe in it. I didn't set up my company for bankruptcy. And from what I have understood about it, is that, you know, it's -- it's just going to increase a lot of expenses, and it's -- and it is expensive.
Q Okay. Do you agree that a judgment should be entered against Starboard in connection with the breach of contract dispute with Heron?
A I mean, yeah. I think that's part of my damages against Safe Harbor. That's kind of the point. So all my defaults and all my damages are my evidence.
Q Gotcha. Okay. We're going to come back to that in detail later. But for now, I guess, let's continue walking through these interrogatories so we can wrap these up.
So the vessel was at the SHLMC -- I've been calling it SMC, I think, or --
A Safe Harbor LMC.
(Crosstalk)
Q The marina, the vessel was at this marina the entire time, correct?

A Yes.

Q Okay. So when you initially spoke with plaintiff's representatives in and around September, the vessel was already there, right?

A Yes.

Q Okay, and so it -- in December was when you received these letters and they started to prevent you from being able to come to the marina to perform work, right?

A On December 11th.

Q All right. So did that clear up at any point in time?

A Yes.

Q When?

A After I dropped my counterclaim and agreed to pay Steven Ivankovich's charge-backs that I charged back because he didn't pay me the two and a half million. And I told you I sent the demand letter and I did what I said I was going to do and somehow I notified them, but they were pissed off about it.

Q So that was when? Can you remind me of the timeframe?

A That was -- I actually -- I just uploaded it all. That's what I put in there, so let me go

shipped. . ."
Is that what we spoke about earlier?
A Correct. The servos and the fins were the only remaining items to be shipped and paid for.
Q And those were not ordered, correct?
A They were ordered. They just hadn't shipped and been paid for yet.
Q Okay. Had the work that needed to be done before those could be installed been completed?
A Not even close.
Q Okay. So is that the current status of the project as well?
A I don't even know, Emily. I'm devastated. I hope it all -- I heard from Henrick, when I last saw him, I asked about it. And I think he said it was done.
Q Okay. But as far as Starboard's concerned, it never was able to -- between you and AME, you were not able to get it to the point where those last parts could be installed, right?
A No. We could have. We were stopped by Aaron. Aaron stopped us. And, yeah, we were going to finish the job. But we were told not to.
Q Okay. So February 6, 2025 is the day you executed a settlement with the marina and then

cases. And I'm trying to make sure the court preserve them, and they don't go to sale because they're irreplaceable and it also disposes of evidence that's critical to my cases.

Q When you say "your cases," which cases do you mean?

A Oh, you don't know.

So I filed Charles Jacob Stratmann versus Seakeeper Madison Industries. I filed Charles Jacob Stratmann against Ivankovich, Madison, Seakeeper, Akerman, Stroup, Moore and 20 John Does.

So I filed -- I started a big RICO case so I can pay you back, Emily, because it's -- I have all the evidence; and it's treble damages plus attorneys' fees, and I need to pay your client back.

Q We'll get back into the RICO case and the website stuff shortly.

A So that's filed.

Q Okay. When was that filed?

A May 3rd, I think.

Q Okay.

A Early May.

Q All right. We're definitely coming back

getting all the information back around again, you know, was -- was challenging.

Q So when you say "they were talking to Humphrees," do you mean James and/or Aaron?

A Correct.

Q What is your understanding of what their discussions with Humphrees were?

A I -- I -- the only thing, you know, I think Humphrees was saying is that they're still waiting on funds from Starboard, which they were. But the question was how much is that amount, right?

And so, of course, that wasn't part of the conversation Humphrees was having with Aaron and James. That's the conversation that Starboard was having with Humphrees and, of course, was eliminated from the conversation. And, again, I didn't -- you know, I didn't want to drag James and Aaron in between, you know, this one and a half year reconciliation and mess that had been through this transition of one rep to the new -- and the Volvo purchase and all that stuff.

Q Okay. So you and Humphrees at this point in time were not on the same page about how much Starboard owed to Humphrees for the outstanding

doubt, you know?
Q Were those earmarked for this project specifically?
A Yeah, I mean, there's no other way to put them on the balance sheet as a customer liability for this -- I mean, it's all tied into the accounting.
Q So why would Marine Max's payments have anything to do with Starboard's ability to pay for the parts that Heron had already paid Starboard for?
A We -- we talked about that. I mean, I had to come up with $230,000 to get back in the marina. And then we were shut down for two months, and now we've got all this lost -- we're buying parts that we can't put on boats, and we've got clients wanting refunds for projects. And it's -- it's affecting our cash flow.
Q And so all of this, including the settlement with the marina, was that all coming out of Starboard's general operating account?
A Yes.
Q Okay. Let's keep scrolling.
So just to backtrack a little bit. He was asking if there was anything that would have

A Well, my Navy Federal. I think -- I think I'm named personally in Hayes.

Q What was the second one you just said Gavin --

A Quintessa Marine Research is coming after me personally. That's why I was able to stand trial. So I was allowed to give opening statements and counter-cross-examine and closing arguments because he was coming after me personally because he has -- he has a 7 million dollar default judgment on a company, and you know why, because an LLC cannot be represented.

Q Okay. I don't have your complaint in front of me right now, but in your recently filed RICO lawsuit, how much are you claiming in damages? Is it aligned with this website figure?

A Yeah. It's around like 300 million --

Q And did you use, forgive for forgetting the name, the software that helped with statistical models, did you use that?

A It's -- it's the Daubert --

Q Daubert, yeah.

A I mean, you studied that, yeah, I mean, that's what it's based on.

Q Okay. So you used this damages model to

come up with a number to put in your complaint that you filed, right?

A Yeah, well, I mean, lot of it is -- a lot of it was already -- what I came up with, you know, from direct evidence in my Quintessa case, you know?

So I mean I had a really strong baseline, you know, and then -- you know, it's just the waterfalling models were, you know, built on, you know, the -- the rest of my data.

Q So do you know what specifically was attributable to the Heron project in this waterfall model?

A Yeah. It would be the amount of your attorneys' fees and how much money, you know, your client is owed that he didn't get the benefit from, from this retaliation event that was -- I mean, just like Seakeeper, they're going to claim to the public that I'm a nuisance. But they're the ones that created this known conflict.

They had the money. They gave me a letter. There's no reason that we couldn't have installed the unit. We received another unit and we installed it months later. And we commissioned it. There was no reason for LMC to get involved

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Nicholas Buckley, Certified Shorthand Reporter, the officer before whom the foregoing deposition was taken, do hereby certify THAT the foregoing transcript is a true and correct record of the testimony given;

THAT said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not requested;

AND THAT I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 1st day of June, 2026.

Nicholas Buckley